**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Case No. 2:07-cv-603** |
| **v.** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **PATRICIA J. TOLER, ET AL,** | : | |
| | : | **Magistrate Judge King** |
| **Defendant**. | : | |
| _____ | : | |
| | : | **Case No. 2:07-cv-863** |
| **PATRICIA A. TOLER,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **Plaintiff,** | : | |
| | : | **Magistrate Judge King** |
| **v.** | : | |
| | : | |
| **THE UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Defendant.** | : | |

**OPINION AND ORDER**

**I. INTRODUCTION**

This matter comes before the Court on cross motions for summary judgment: (1) the

United States' Motion for Summary Judgment on its foreclosure claim against Maurice A. Toler,

Patricia J. Toler, Dorothy Toler, and Patricia A. Toler (hereinafter the "Defendants") and

Plaintiff Patricia A. Toler's wrongful levy claim (Dkt. 69); and (2) Defendants' Motion for

Summary Judgment against the United States on the IRS's foreclosure claim (Dkt. 68).  The

Defendants seek summary judgment solely on the United States' foreclosure claim.  The United

States seeks summary judgment on five issues: 1) judgment that defendants Maurice A. Toler

and Patricia J. Toler are personally liable, jointly and severally, to the United States in the

amount of $380,392.31, plus interest and statutory accruals from September 15, 2008;

2) judgment that there exist federal tax liens securing the tax liabilities of Maurice A. Toler and Patricia J. Toler in the amount of 767,289.37, plus interest and statutory accruals from September 15, 2008, that may be enforced against the parcels of real property at issue in the foreclosure case; 3) judgment that defendant Maurice A. Toler is personally liable to the United States in the amount of $108,681.81, plus interest and statutory accruals from September 15, 2008, for unpaid trust fund recovery penalties, pursuant to 26 U.S.C. § 6672, resulting from his willful failure to collect, truthfully account for, or pay over the income and Federal Insurance Contributions Act taxes withheld from the wages of the employees of Trimat, Inc., and that the federal tax liens securing the same liabilities may also be enforced against the real properties at issue in the foreclosure case; 4) judgment allowing the United States to foreclose its federal tax liens against Parcels A through F, as identified in the United States' Amended Complaint, and to have those properties sold free and clear of all liens and interests of the parties, with proceeds of sale to be distributed according to the parties' lawful priorities; and 5) judgment that Plaintiff Patricia A. Toler take nothing by way of relief requested in her complaint in the wrongful levy case.  For the reasons set forth below, this Court: (1) **DENIES** the Defendants' Motion; and  (2) **GRANTS** in part and **DENIES** in part the United States' Motion.

## II. BACKGROUND

## A. FACTUAL BACKGROUND

### 1. The Parties

There are seven parties involved in this matter: 1) the United States; 2) taxpayer-defendant Maurice A. Toler ("Maurice); 3) taxpayer-defendant Patricia J. Toler ("Patricia"); 4) non taxpayer-Defendant Dorothy L. Toler ("Dorothy"), who is also Maurice's mother; 5) non taxpayer-defendant and plaintiff Patricia A. Toler ("Trisha"), who is the daughter of Maurice and Patricia; 6) P.J.T., Inc. ("P.J.T."); and 7) Trimat Construction, Inc. ("Trimat").

Maurice and Patricia were the sole shareholders and owners of P.J.T..  When they incorporated P.J.T. on April 28, 1980, Maurice and Patricia were married.  They divorced in 2001 and separated for a period of time.  Maurice and Patricia, however,  are currently living together at 879 Homewood Drive.  Maurice and Patricia have two children, Matthew and Trisha.  Dorothy is Maurice's mother.  Dorothy was owner and sole shareholder of Trimat until 2004, as well as a creditor of P.J.T.  Matthew, Maurice and Patricia's son, is the current owner of Trimat.  Trisha is the current title holder of all of the parcels at issue in this case.

P.J.T., a family farm owned and operated by Maurice and Patricia,  was incorporated by Maurice on April 28, 1980, and ceased active operation in 1990.  The Articles of Incorporation were not cancelled until February 20, 1999.  As late as November 2004, P.J.T. still held title to property.  The initial P.J.T. stand for "Patricia J. Toler," taxpayer-defendant Patricia J. Toler's full name.  Maurice and Patricia had full responsibility for P.J.T.   Maurice entered into contracts on behalf of P.J.T.  He was responsible for keeping the books and records, and had sole hiring and firing responsibility.  Maurice, Patricia, and their children had their family home on land that

was titled to P.J.T. The family also used the property for recreational activities including hunting, fishing, sleigh rides, use of four wheel drive and all-terrain vehicles, and horseback riding. For recreation, Patricia and Trisha rode horses owned by P.J.T. in horse shows across three states. In 1983, P.J.T. entered into a land contract with Richard and Avenell Mount, in which P.J.T. agreed to pay $200,000 in exchange for title to real property in Bidwell, Ohio.[1] The land contract covered 330 acres, including what became Maurice and Patricia's family home at 879 Homewood Drive in Bidwell, Ohio, and the surrounding farm. Maurice and Patricia, along with their children, moved to 879 Homewood Drive some time in the early 1980s. P.J.T. stopped making the required monthly payments on the Mount Land Contract due to lack of funds, and the Mounts sued to forfeit the contract on November 19, 1986. In order to prevent losing their home and farm, Maurice and Patricia asked Dorothy to help them with the payments, as they did not have the funds and could not take out a loan due to poor credit. Dorothy obtained a mortgage from First Huntington National Bank for $125,000 to pay off the Mount land contract. Pursuant to the land contract, the Mounts transferred the property on March 23, 1987 to P.J.T. That same day, P.J.T., by its president Maurice, transferred title to Dorothy. Maurice and Patricia state that they transferred title to Dorothy in exchange for Dorothy obtaining the loan.[2] There are no written agreements memorializing this transaction. The loan payments were made by Trimat rather than Dorothy. Although there was a lease agreement that called for P.J.T.

---

[1] Richard Mount had been a business partner of Maurice's, and the two had co-founded M&T Construction, which went out of business in 1990.

[2] P.J.T. transferred various other properties to Dorothy, as described below, allegedly in order to repay Dorothy for money she loaned to P.J.T. There are no written records or agreements regarding the amount of money Dorothy loaned to P.J.T.. Nor is there any evidence of appraisals or records of the worth of the various properties at issue

and Maurice to pay rent to Dorothy, no rent was ever paid. After the land transfer, Maurice and Patricia continued to use the land as before, as a residence, for recreational activities, and for farming. P.J.T. ceased operations in 1990, and cancelled its Articles of Incorporation in 1999. The 879 Homewood property is still the residence of Maurice and Patricia, although it is now owned by Trisha. Maurice and Patricia continue to live rent free.

Trimat was incorporated on May 6, 1991 by Dorothy. She provided the capital for the company so that her son, Maurice, would have gainful employment. "Trimat" is a combination of Maurice and Patricia's children's names (Matthew and Trisha). Dorothy, although the official owner and president, did not participate in the running or management of Trimat. She had no prior construction experience, and acknowledges that she started the business for Maurice.

Maurice was the manager and boss at Trimat.[3] Maurice entered into contracts on behalf of Trimat, he supervised employees, made all personnel decisions, negotiated and entered into contracts, and served as the keeper of records and manager of all bank accounts and financing. Maurice and Patricia also used Trimat funds for their personal use. In 1997, the Tolers purchased a corvette with Trimat funds. The car, for which Patty signed a check on behalf of Trimat, was worth $28,575.00. In 1998, the Toler's purchased a Lincoln Navigator with Trimat funds. That same year, Maurice and Patricia purchased a 22-foot Sea Ray boat, which was titled to Matthew but paid for with Trimat funds. Insurance for the Sea Ray was held in Maurice's individual capacity. The three vehicles together cost approximately $90,000. Patricia also bought home furnishings, a home spa cover, and bedroom accessories with Trimat funds.

---

[3] Maurice's statements and tax forms show that he made a modest income from Trimat. He also had a 1998 life insurance policy, however, that stated that he was the owner/president of Trimat and stated that his annual income was $180,000 and that he had a net worth of $400,000.

Matthew Toler purchased $1,917.01 in guns and related accessories in 1997, and Trisha's high school class ring was bought with Trimat's corporate account.

Finally, there is some evidence that P.J.T. and Trimat also commingled funds. Trimat paid P.J.T.'s corporate filing fee to the State of Ohio in 1995. Additionally, Patricia deposited a check made out to P.J.T. & Trimat (from Jackie and Peggy Williams) into her personal checking account in 1993.

Maurice ceased to be the manager of Trimat when Dorothy gifted Trimat to her grandson, Matthew in 2004. When Trimat was transferred to Matthew, he also took over some of Maurice's responsibilities. Maurice continues to work for Trimat.

## 2. The Parcels

There are seven parcels of land at issue in this case, six in the foreclosure suit (Parcels A-F) brought by the United States, and one (Parcel G) in the wrongful levy suit brought by Trisha. The descriptions of the properties and the related transfers are described herein.

### a. Homewood Drive Properties

Parcels A, B, and G consist of the 879 Homewood Drive property and surrounding farm.

Parcel A is made up of 5.65 acres and contains the residence used by Maurice and Patricia. Maurice and Patricia have continuously used the 879 Homewood Drive residence since the early 1980s.[4] There was no consideration for this property, and the Tolers consider the transfer to be a gift. Parcel G is made up of 97 of acres land surrounding the residence that was used for crops, livestock, and horse stables and was also part of the Mount Land Contract. Title to Parcels A and G was transferred on March 23, 1987 from the Mounts to P.J.T. That same day,

---

[4] Maurice did have a gap in residence in 2001 when he and Patricia divorced.

title was transferred from P.J.T. to Dorothy Toler.  Maurice and Patricia state that the transfers to Dorothy were in exchange for the loan she took out to pay off the Mount Land Contract.  The final transfer of Parcel A was from Dorothy to Trisha on November 10, 2004, and the final transfer of Parcel G was from Dorothy to Trisha on November 22, 2004.

Parcel B consists of 22.02 acres of surrounding farmland to the 879 Homewood Drive property, and was acquired by P.J.T. in 1986.  On July 22, 1989, P.J.T. transferred title of Parcel B to Dorothy.  Maurice states that this conveyance was meant to pay back Dorothy for loans that she gave to P.J.T.  Dorothy then transferred Parcel B to Trisha on November 8, 2004 as a gift and for no consideration.

The Homewood Drive properties, in addition to being used for farming, were used for the recreational activities described above.  This use continues today.

### b. State Route 554 Properties

Parcels C, D, E, and F are located on State Route 554 in Bidwell, and include the Trimat shop and office.  Title to the State Route 554 properties was acquired by P.J.T. in the 1980s.

Parcel C consists of 6.193 acres, and includes portions of acres transferred by Larry and Mary Beaver (stepfather and mother of Patricia) to P.J.T. on April 28, 1980.  This land was used for cattle grazing, and after P.J.T. stopped operations, it sat vacant until in became Trimat's shop location in the 1990s.  Title to Parcel C was transferred from P.J.T. to Dorothy on June 14, 1989.  Maurice and Patricia state that the transfer was in consideration for loans that Dorothy gave to P.J.T.  There are no written records of the agreement or of the loans.  Dorothy transferred Parcel C to Trisha as a gift and for no consideration on November 8, 2004.

Parcel D consists of the 47.7 acres acquired by P.J.T. from Franklin Beach on July 13, 1981, except for 1.817 acres carved out in the January 30, 1997 deed from P.J.T. to Dorothy. Parcel D was used for farming by P.J.T., and then later used by Trimat. Parcel D was transferred from P.J.T. to Dorothy on January 30, 1997. The Defendants state that this transfer was also in repayment for loans from Dorothy to P.J.T. Once again, there are no records of the loan from Dorothy or an agreement between the parties. Dorothy transferred Parcel D to Trisha on November 8, 2004. Parcel E consists of the 1.817 acres carved out of the Franklin Beach conveyance to P.J.T. It has been the location of the Trimat office since the 1990s. Parcel E, however, was transferred from P.J.T. to Trimat on January 30, 1997. Defendants submit that this transfer was also in repayment for loans from Dorothy to P.J.T., despite the fact that this transfer was to Trimat and not Dorothy. On November 10, 2004, Trimat transferred Parcel E to Trisha as a gift and for no consideration.

Parcel F consists of 23 acres, title to which was acquired by P.J.T. from Thomas and Elizabeth Daniels on June 18, 1982. P.J.T. kept livestock on this property from 1982-90. The property has been vacant since P.J.T. ceased operations. P.J.T. originally paid the property taxes on the property until 1985 or 1986, at which point Dorothy and Trimat paid the property taxes. Title to Parcel F remained with P.J.T. until 2004.[5] Parcel F was transferred from P.J.T. to Trisha in 2004 as a gift and for no consideration.

---

[5] The Defendants claim that this property was intended to be transferred to Dorothy in the late 1980s, but was inadvertently left out of the other transfers. While this may be the case, the fact remains that the property remained with P.J.T. until Dorothy requested that it be transferred to Trisha with the other November 2004 gifts.

### c. Transfers to Trisha

After the transfers to Trisha in November of 2004, the use of all of the properties remains the same. Trimat pays the property taxes for all of the properties, including those that are not used by Trimat. Dorothy states that she transferred the properties to Trisha after consulting with her attorney and deciding to divest herself of all her assets.

### B. PROCEDURAL BACKGROUND

### 1. The Current Action

On June 22, 2007, the United States initiated this action against the taxpayer-defendants to reduce their outstanding federal tax liabilities to judgment. On October 29, 2007, The United States filed an Amended Complaint against Defendants Maurice A. Toler, Patricia J. Toler, Dorothy L. Toler, and Patricia A. Toler in order to: (1) reduce to judgment the defendant-taxpayers Patricia J. Toler and Maurice A. Toler joint assessed federal income tax liabilities, plus interest and other statutory additions; (2) reduce to judgment trust fund recovery penalties assessed against defendant-taxpayers Patricia J. Toler and Maurice A. Toler, plus interest and other statutory additions; and (3) to foreclose the federal tax liens associated with those assessments against six parcels of real property, record title to which is held in the name of Patricia A. Toler ("Trisha"). Plaintiff Patricia A. Toler ("Trisha") filed a separate civil action on August 28, 2007 against the United States related to the same parcels of land, claiming a wrongful levy action under 26 U.S.C. § 7426. Upon an unopposed Motion from Trisha, these two actions were consolidated on February 7, 2008. Cross Motions for Summary Judgement are now before the Court on the foreclosure claims brought by the United States. Additionally, the

United States seeks summary judgment on Plaintiff Patricia A. Toler's ("Trisha's") wrongful levy suit.

## 2. Tax Liens

The United States Government has issued a series of tax assessments against Maurice and Patricia, which have given rise to tax liens under 26 U.S.C. §§ 6321, 6322. The first assessments were made on September 3 and 23, 1996 by delegates of the Secretary of the Treasury of the United States of America for unpaid federal income taxes against Maurice and Patricia for the tax years 1985-1990. An additional assessment for unpaid federal income tax against Maurice and Patricia was made on March 3, 2004 for the 1999 tax year. The unpaid balance on the assessments for tax years 1985-90 and 1999 is $380,392.31, plus interest and statutory accruals from September 15, 2008. The amount does not include penalties and interest on the penalties that were discharged in bankruptcy in the United States Bankruptcy Court for the Southern District of Ohio, Case Nos. 05-68457 and 05-68461. The amount collectible based upon the United States' pre-bankruptcy liens is $767,298.37, plus interest and statutory accruals from September 15, 2008.

On April 13, 2005, pursuant to 26 U.S.C. § 6672, the IRS assessed trust fund recovery penalties against Maurice by reason of his willful failure to collect, truthfully account for, or pay over the income and Federal Insurance Contributions Act taxes withheld from the wages of the employees of Trimat. This assessment was for the quarterly tax periods ending in March 31, 1998; June 30, 1998; September 30, 1998; September 30, 2000; December 31, 2000; March 31, 2001; March 31, 2004; June 30, 2004; and September 30, 2004. The original amount assessed was $150,654, with $108,682 remaining unpaid as of September 15, 2008.

On May 16, 2007, the United States served a notice of levy on Parcel G on the basis of the liens.  This is the subject of the wrongful levy case.

### 3. Other Actions

The Defendants in this case have been parties in several other actions.  While not directly bearing on the case, a description of the other proceedings provides useful background.

First, in his capacity as a co-founder of M&T Construction, Maurice was charged in the Untied States District Court for the Southern District of West Virginia with two criminal counts: 1) making false statements to HUD from spring 1987 through winter 1989; and 2) filing a false federal income tax return for the 1987 tax year that "did not disclose all sources of income." Maurice pled guilty to both counts in August 1991.  He was placed on probation for five years and ordered to pay $180,588 in restitution to HUD.  The payment has never been made in full.

Second, on January 21, 1991, Maurice and Patricia filed for bankruptcy protection under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Ohio, Eastern Division.  Case No. 2:91-bk-25381 (Bankr. S.D. Ohio Jan. 7, 1992). On January 7, 1992, Maurice and Patricia received a discharge of their debts.

Third, on September 28, 2005, Maurice and Patricia filed for bankruptcy protection under Chapter 7 of the Bankruptcy Code for a second time. Case Nos. 05-68457 and 05-68461 (Bankr. S.D. Ohio May 5, 2006).  Maurice and Patricia received discharge of their debts.  In the course of the proceedings, Maurice and Patricia entered into an Agreed Order with the IRS, in which the parties agreed that certain tax liabilities and penalties of Maurice and Patricia  for the years in question were subject to discharge.  The Agreed Order does not specifically avoid or eliminate the federal tax liens.

Finally, on October 18, 2004 Dorothy had a $189,388.22 judgment entered against her and in favor of Wolohan Lumber Company in the Common Pleas Court of Lawrence County, Ohio. On December 15, 2004, in that same case, she had a judgment entered against her and in favor of Mid-State Surety Corporation for $158,748.08.[6]  Both judgments were against Trimat, Matthew Toler, and Dorothy, jointly and severally.

### III. STANDARD OF REVIEW

Summary judgment is proper if "there is no genuine issue as to any material fact [such that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©.  But "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, a court must construe the evidence in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The movant therefore has the burden of establishing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.  But the non-moving party "may not rest merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e)(2); *see Celotex*, 477 U.S. at 324; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1994). The non-moving party must present "significant probative

---

[6] As shown in the descriptions of the parcel conveyances above, the transfers to Trisha took place between the two judgments.

evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When ruling on a motion for summary judgment, a district court is not required to sift through the entire record to drum up facts that might support the nonmoving party's claim. *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Instead, the Court may rely on the evidence called to its attention by the parties. *Id.*

The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation:

> The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts . . . Rather, the court must evaluate each party's motion on its own merits . . .

*Taft Broad. Co. v. U.S.*, 929 F.2d 240, 248 (6th Cir. 1991) (citations omitted).

## IV. LAW AND ANALYSIS

### A. MAURICE AND PATRICIA'S FEDERAL INCOME TAX LIABILITY

In its motion for summary judgment, the United States seeks "judgment that defendants Maurice A. Toler and Patricia J. Toler are personally liable, jointly and severally, to the United States in the amount of $380,392.21, plus interest and statutory accruals from September 15, 2008, that being the portion of their federal income tax liabilities that was not discharged in their bankruptcy." The Federal Government can establish a prima facie case of tax liability by producing Certificates of Assessments and Payments. *Sinder v. United States*, 655 F.2d 729, 731 (6th Cir. 1981); *United States v. Noble*, Nos. 99-2032, 99-2259, 2001 U.S. App. LEXIS 1824, at **5 (6th Cir. Jan. 29, 2001); *see also Zack v. Comm'r*, 692 F.2d 28, 29 (6th Cir. 1982) (holding

that the tax commissioner's determination of tax liability is presumptively correct). In the

absence of evidence to the contrary, Certificates of Assessments and Payments are sufficient

proof of the adequacy of propriety of notices and assessments that have been made by the IRS.

*Gentry v. United States*, 962 F.2d 555, 557 (6th Cir 1992) (citing to *United States v. Walton*, 900

F.2d 915, 918-19 (6th Cir. 1990)).

In this case, the United States has submitted Certificates of Assessments and Payments

for Maurice and Patricia for income tax years 1985-1990, and 1999. Maurice and Patricia do not

contest these assessments, nor do they provide any evidence that the Certificates of Assessments

and Payments are erroneous. The United States has thus made a prima facie case of tax liability.

Therefore, the United States' Motion for Summary Judgment on Maurice and Patricia's federal

income tax liability for $380,392.31, plus interest and statutory accruals from September 15,

2008, is **GRANTED.**

### B. MAURICE'S LIABILITY FOR TRUST FUND RECOVERY PENALTIES

In its motion for summary judgment, the United States seeks "judgement that defendant

Maurice A. Toler is personally liable to the United States in the amount of $108,681.81, plus

interest and statutory accruals from September 15, 2008, for unpaid trust fund recovery penalties,

pursuant to 26 U.S.C. § 6672 . . ." The United States alleges that these trust fund recovery

penalties result from Maurice's "failure to collect, truthfully account for, or pay over the income

and Federal Insurance Contributions Act taxes withheld from the wages of the employees of

Trimat Inc." The tax periods at issue are March 31, 1998; June 30, 1998; September 30, 1998;

September 30, 2000; December 31, 2000; March 31, 2001; March 31, 2004; June 30, 2004; and

September 30, 2004. As stated above, the Federal Government can establish a prima facie case

of tax liability by producing Certificates of Assessments and Payments. *Noble*, 2001 U.S. App.

LEXIS 1824 at **5. In the absence of evidence to the contrary, Certificates of Assessments and

Payments are sufficient proof of the adequacy of propriety of notices and assessments that have

been made by the IRS. *Gentry*, 962 F.2d at 557.

In this case, the United States has submitted Certificates of Assessments and Payments

for Maurice for the quarterly tax periods identified above. Maurice does contest these

assessments, nor does he provide any evidence that the Certificates of Assessments and

Payments are erroneous.[7] The United States has thus made a prima facie case of tax liability.

Therefore, the United States' Motion for Summary Judgment on Maurice's liability for unpaid

trust fund recovery penalties in the amount of $108,681.81, plus interest and statutory accruals

from September 15, 2008, is **GRANTED.**

### C. EXISTENCE OF FEDERAL TAX LIENS SECURING THE INCOME TAX LIABILITIES OF MAURICE AND PATRICIA AND THE TRUST FUND RECOVERY PENALTY LIABILITY OF MAURICE

The United States seeks summary judgment that there exist federal tax liens securing the

tax liabilities described above. Under § 6322, a federal tax lien imposed by § 6321 "shall arise at

the time the assessment is made." 26 U.S.C. §6322; *see also McGinness v. United States*, 238

F.3d 422, 422 (6th Cir. 2000); *Nantucket Village Dev. Co. v. United States*, No. 5:99 CV 230,

2001 U.S. Dist. LEXIS 1064, at *12 (N.D. Ohio Jan. 9, 2001). The assessments for the joint

federal income tax liabilities were made on September 3 and 23, 1996 (for income tax years

---

[7] In their summary judgment memorandum, the Defendants note that Trimat has reduced the amount owed on the trust fund recovery penalties due to payments on for the quarterly tax periods in 1998-2001. It is undisputed, however, that the payments for 2004 have still not been made, and total $108,681.81.

15

1985-1990), and March 3, 2004 (for income tax year 1999). The assessments for the trust fund recovery penalties were made on April 13, 2005. Federal tax liens securing the joint income tax liabilities of Maurice and Patricia and the trust fund recovery penalty liability of Maurice, exist as of September 3, 1996; September 23, 1996; March 3, 2004; and April 13, 2005.

It is a fundamental principal of bankruptcy law that valid liens, including tax liens, survive a bankruptcy discharge. *In re Jarrett*, 293 B.R. 127, 131 (Bankr. N.D. Ohio 2002); *In re Deppisch*, 227 B.R. 806, 808-09 (Bankr. S.D. Ohio 1998); *see also Davilla v. Harman*, Nos. 97 CV 2657; 05 CV 3159, 2007 WL 1815045, at *5 (Ohio App. 7 Dist. June 22, 2007) (finding no reversible error where a lower court determined that property tax liens survived bankruptcy). While a bankruptcy discharge prevents enforcing a claim against the debtor in-personam, it leaves enact an in rem action against the debtor. *Johnson v. Home State Bank*, 501 U.S. 78, 84 (1991). Thus, although the Defendant Taxpayers (Maurice and Patricia), entered into an Agreed Order in September, 2005 that all the penalties and related interest on the joint federal income tax liabilities were dischargeable, there still remain federal tax liens in the amount of $767,289.37 which may be enforced in an in-rem action. The tax liens at issue in both the joint income tax liabilities and the trust fund recovery penalties were assessed *prior* to the bankruptcy discharge, and as such, the pre-bankruptcy liens remain. Therefore, the United States' Motion for Summary

Judgment on the existence of federal tax liens for the income tax liability of Maurice and Patricia for $767,289.37, and for the trust fund recovery penalty liability of Maurice for $108,681,81 is **GRANTED**.[8]

### D.  ENFORCING THE FEDERAL TAX LIENS BY FORECLOSING ON THE REAL PROPERTIES AT ISSUE

The United States and the Defendants both seek summary judgment on the issue of whether the United States may foreclose upon Parcels A through F in order to enforce its federal tax liens.  Section § 6321, in pertinent part, provides: "[i]f any person liable to pay any tax neglects or refuses to pay the same after demand, the amount...shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."  26 U.S.C. § 6321.  The Supreme Court has held that § 6321 "is broad and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have." *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 719-20 (1985); *see also Glass City Bank v. United States*, 326 U.S. 265, 267 (1945) ("Stronger language could hardly have been selected to reveal a purpose to assure the collection of taxes.").  In using such a broad definition of property, the aim is to reach " 'every species of right or interest protected by law and having an exchangeable value.' " *Jewett v. Comm'r*, 455 U.S. 305, 309 (1982) (quoting S. Rep. No. 665, 72d Cong., 1st Sess., 39 (1932); H.R. Rep. No. 708, 72d Cong., 1st Sess., 27 (1932)).

As noted earlier, a federal tax lien arises at the time a tax assessment is made.  26 U.S.C. § 6322.  Tax liens are not, however, self-enforcing. The Government may enforce the lien in two

---

[8]  This Court does not reach the issue of whether the federal tax liens may be enforced against the parcels of real property at issue in the foreclosure case in this section.

ways: 1) a lien-foreclosure suit; or 2) an administrative levy. *Nat'l Bank of Commerce*, 472 U.S. at 720; *Am. Trust v. Am. Cmty. Mut. Ins. Co.*, 142 F.3d 920, 922 (6th Cir. 1998). In this case, the Government is pursuing a lien-foreclosure suit.

Having established that the United States may reach any type of interest in property a tax payer may have through a lien-foreclosure suit, the Court must determine whether a property interest exists. The Supreme Court addressed this issue as it pertains to federal tax lien statutes in *Drye v. U.S.*, 528 U.S. 49 (1999), finding that:

> [t]he question whether a state-law right constitutes property or rights to property is a matter of federal law. We look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as "property" or "rights to property" within the compass of the federal tax lien legislation.

*Id.* at 58 (internal citations omitted). A federal tax lien does not, however, arise to a right in property when a person has no interest under the laws of the state in which she resides. *Spotts v. United States*, 429 F.3d 248, 251 (6th Cir. 2005). The United States argues that Ohio law should not necessarily determine whether nominee and/or alter ego doctrine apply in this case, and relying on *Craft v. United States*, 535 U.S. 274 (2002). The Court in *Craft* did not hold that state law has no role; rather, it held that whether a particular state-granted right or interest is considered to be a *property* right is a matter of federal law. *Id.* at 278. Thus, this Court must first look to Ohio law to determine whether Maurice and Patricia have any right or interest in Parcels A through G, such that federal law recognizes a property interest and the IRS can foreclose on the tax liens. The United States argues that there are two doctrines under which Maurice and Patricia can be found to have an interest in Parcels A through G. The first is nominee theory, the second is alter ego and fraudulent conveyance.

18

## **1. Nominee Theory**

Having established that the Court must use Ohio law to determine whether P.J.T., Trimat, Dorothy, and Trisha were nominees of Maurice and Patricia, the Court turns to whether the nominee theory of recovery is applicable under Ohio law. Nominee theory allows a creditor to recover from a debtor where there seems to be a relationship between a debtor and an asset such that there is a concealed understanding between the debtor and the nominal owner that one is holding legal title for the other. As set forth below, this Court finds nominee theory is not recognized under Ohio law.

The United States relies upon *Nantucket Vill. Dev. Co. v. United States*, No. 5:99 CV 230, 2001 U.S. Dist. LEXIS 1064 (N.D. Ohio Jan. 9, 2001) and *United States v. Gaumer*, No. 4:07 CV 1352, 2007 WL 4365399 (N.D. Ohio Dec. 10, 2007) to support its argument that Ohio recognizes nominee theory. In *Nantucket Village*, the Northern District of Ohio, acknowledging the split among Ohio district courts, surveyed the approach that various federal courts have taken in analyzing nominee doctrine. The court did not cite to any Ohio state cases that acknowledge nominee theory, but determined that "the United States may bring a cause of action under the nominee doctrine." *Nantucket Vill.* at *26. The court then went on to say that "it is clear that Ohio law recognizes the concept of equitable ownership, despite the fact that the term 'nominee doctrine' is not used." *Id.* at *27. To explain the concept of equitable ownership, the court cited to *Flint v. Holbrook*, 80 Ohio App.3d 21 (1992). In *Flint v. Holbrook*, the court dealt with a land contract, where the vendee of the land occupied and controlled the land but had not completed payments on the land. There, the court found that the vendor, who was to retain legal title to the land as security until the vendee had completed payments, held bare legal title, and that the

vendee was the equitable owner. *Id.* at 27. This concept of equitable ownership is different from that of nominee doctrine. In the case of equitable ownership, the person or entity holding bare legal title is not doing so in an attempt to conceal the true equitable owner, but rather is doing so as security for a payment. *See also Blue Ash Bldg. & Loan Co. v. Hahn*, 20 Ohio App.3d 21, 24 (1984). This Court finds, therefore, that equitable ownership is not synonymous with nominee doctrine.

In *Gaumer*, 2007 WL 4365399, the court relied on *Nantucket Village* and *Flint*, and stated "although Ohio law does not explicitly recognize 'nominee theory' of ownership, it does recognize 'equitable ownership,' which is akin to 'nominee theory.'. *Id.* at *3. The court identified the factors used to evaluate nominee theory. *See United States v. Spotts*, 429 F.3d 248, 248 n.2 (6th Cir. 2005)(setting forth nominee theory factors)[9]. In *Spotts*, the Sixth Circuit remanded the case to district court to determine whether the appellant, under Kentucky law, held an interest in the property at issue as a nominee pursuant to the holding in *Drye*.[10] *Id.* at 253.

---

[9] Footnote two in *Spotts* listed the following factors that others courts have used in evaluating nominee doctrine:
       (1) whether inadequate or no consideration was paid by the nominee;
       (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property;
       (3) whether there is a close relationship between the nominee and the transferor;
       (4) whether they failed to record the conveyance;
       (5) whether the transferor retained possession; and
       (6) whether the transferor continues to enjoy the benefits of the transferred property.
*Spotts*, 429 F.3d at 248 n.2.

[10] The United States attempts to distinguish *Spotts* by emphasizing the fact that the court in *Spotts* accepted the United States' position that state law is used to determine property rights, and claims that under *Craft*, federal common law should be used to determine whether nominee

Although the Sixth Circuit required the district court to evaluate nominee theory under Kentucky law, in footnote 2 of *Spotts*, the court noted six factors that other federal courts have used in evaluating nominee questions. *Id.* at 248, 248 n.2. The *Spotts* court did not find that Kentucky law uses those factors, and certainly did not answer the question of whether Ohio law recognizes nominee theory and incorporates those factors. The court in *Gaumer* relied on the *Spotts* factors and the analysis in *Nantucket Village*, but did not cite to any Ohio cases that found nominee theory under Ohio law.[11] *Gaumer*, 2007 WL 4365399 at *3.

In *Kaiser v. Stedman*, No. C:2-95-1074, 1999 U.S. Dist. LEXIS 15327 (S.D. Ohio Sept. 9, 1999), the court found that neither the parties nor the court found any Ohio court case applying the nominee doctrine. *Id.* at *66. This Court is at a similar loss for any such case, and having been provided none by the parties, finds that Ohio law does not recognize nominee theory. Accordingly, the United States cannot proceed with foreclosure on the tax liens based on nominee theory alone.

## 2. Alter Ego Theory

theory applies in this case. While this Court agrees with the United States that whether a particular state granted right/interest is a "property right" is a question of federal law, the initial inquiry requires an analysis of state law to determine whether any right/interest (property or not) exists. This is essentially what the 6th Circuit did in *Spotts.*

[11]Other courts have committed the same error as the *Gaumer* court by citing to non-Ohio case law for the elements of the nominee doctrine. These include *United States v. Smith*, No. 1:99 cv-974-TSH, 2008 U.S. Dist. LEXIS 96869, at *31-32 (S.D. Ohio Nov. 19, 2008) (citing to *Spotts*, *Gaumer*, and *Nantucket Village*); *United States v. Prather*, No. C-1-00-982, 2002 U.S. Dist. LEXIS 22456, *4 (S.D. Ohio Oct. 17, 2002) (citing to an Eighth Circuit case for determining the factors used in nominee inquiries); *United States v. Dusterberg*, No. C-2-95-976, 1997 U.S. Dist. LEXIS 5009, at *2 (S.D. Ohio Mar. 12, 1997) (citing to two cases that did not apply nominee doctrine, and using factors from other states in order to assist in the nominee inquiry).

The United States argues, in the alternative, that under alter ego theory, Maurice and Patricia have an interest in Parcels A-G, such that it may foreclose on the tax liens and receive summary judgment on Trisha's wrongful levy claim. Just as with nominee theory,[12] the Court must look at Ohio law to determine whether alter ego theory is available, and if so, whether it applies in this case.

The Sixth Circuit recently decided a case that speaks to the issue of alter ego theory. In *In re Fisher*, Nos. 07-3319; 07-3320, 2008 WL 4569946 (6th Cir. Oct. 10, 2008), the court held that while Ohio courts have not adopted reverse-piercing, "veil piercing and *alter ego* concepts are distinct." *Id.* at *506. The court reasoned that "[t]he former [veil piercing] asks a court o hold A vicariously liable for B's debts, while the latter [alter ego] asserts that A and B are the same entity and therefore liability is direct." *Id.* (citing to *IUUA Local 600 v. Aguirre*, 410 F.3d 297, 302 (6th Cir. 2005)). *In re Fisher* then cited to the following seven factors that a court in Ohio may consider in deciding whether to disregard the corporate fiction under the alter ego theory:

> (1) grossly inadequate capitalization;
> (2) failure to observe corporate formalities;
> (3) insolvency of the debtor corporation at the time the debt is incurred;
> (4) shareholders holding themselves out as personally liable for certain corporate
>      obligations;
> (5) diversion of funds or other property of the company property for personal use;
> (6) absence of corporate records; and
> (7) the fact that the corporation was a mere facade for the operations of the
>      dominant shareholder(s).

---

[12] The United States argues that federal common law on alter ego theory should apply in this case. For the reasons already cited, this Court must first look to state law to determine whether an interest exists. Furthermore, the United States does not provide the Court with any cases that apply federal common law for alter ego theory in a tax lien case, nor does it provide the court with the federal common law standard for alter ego theory as applied to tax lien cases.

*Id.* (citing to *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605 (6th Cir. 2005) and *Carter-Jones Lumber Co. v. LTV Steel Co.*, 237 F.3d 745, 749 (6th Cir. 2001)).

The Tolers do not distinguish between the concepts of alter ego and piercing the corporate veil. In their Motion, they assert that under *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506 (2008), piercing the corporate veil is a rare exception. They explain that in order to pierce the veil, three elements must be proven: 1) control that is so complete over the corporation by those to be held liable that the corporation has no separate mind, will, or existence of its own; 2) that control is exercised in such a manner as to commit fraud, an illegal act, or a similarly unlawful act against the entity seeking to disregard the corporate form; and 3) injury or unjust loss resulting from such control and wrongdoing to the party seeking to pierce. *Belvedere Condo. Unit Owners' Assn v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274 (Ohio 1993); *Dombroski v. WellPoint, Inc.*,119 Ohio St.3d 506, 511-12 (Ohio 2008) (*Dombroski* modified prong two of the *Belvedere* test, incorporating not just an illegal act, but also an unlawful act); *Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 605 (6th Cir. 2005). While the Defendants brief the law on veil piercing correctly, they fail to address the decision from *In re Fisher* in any of their briefs.

The United States responds to the Defendants' arguments by first claiming that reverse piercing is actually the correct analysis (although admits that courts have either found that reverse piercing is not available under Ohio law, or that the same three-part test from *Belvedere* applies), citing to *Humitsch v. Collier*, No. 99 L-099, 2001 WL 20733, at *5 (Ohio Ct. App. Dec. 29, 2000) and *Geiger v. King*, 158 Ohio App.3d 288, 290-91 (Ohio Ct. App. 2004). While not clearly arguing in the alternative, the IRS then relies on *In re Fisher* as support for applying

federal common law for the alter ego theory for tax collection purposes, and as support for the conclusion that the alter ego concept is distinct from corporate veil piercing.

Given the recent decision by the Sixth Circuit on this very point of law, and because no subsequent decisions have questioned the analysis in *In re Fisher*, this Court finds that Ohio law does recognize alter ego doctrine as distinct from veil piercing.[13] This Court declines to adopt the United States' argument that *In re Fisher* supports using federal common law. The Sixth Circuit did not find it necessary to turn to federal common law in order to determine the legal test for alter ego theory. Instead, it held that Ohio law recognizes the alter ego theory, and relied on cases citing Ohio law for determining the factors to be used in alter ego inquiries. This Court adopts the reasoning of *In re Fisher*, and finds that the seven factor test should be considered to determine whether an entity is the alter ego of its shareholder and that the corporate fiction should be disregarded. It should be noted, however, that "because of the equitable nature of the veil-piercing doctrine, no list of factors can be exclusive or exhaustive." *Taylor Steel*, 417 F.3d at 605 (citing *Carter-Jones,* 237 F.3d at 749 (applying Ohio law)). Additionally, the Sixth Circuit has noted that "none of these factors is a prerequisite to a finding that the corporate form has been violated." *Transition Healthcare Assocs. v. Tri-State Health Investors, LLC*, No. 08-3496, 2009 U.S. App. LEXIS 636, at \*\*21 (6th Cir. Jan. 9, 2009).

---

[13] This is also supported by the fact that cases interpreting the *Belvedere* test refer to the first prong of the test as the alter ego doctrine and cite to the six factors referred to in *In re Fisher*, supporting the argument that the alter ego doctrine is a separate inquiry from veil piercing. *See, e.g.*, *Taylor Steel,* 417 F.3d at 605; *Carter-Jones*, 237 F.3d at 749; *Pottschmidt*,169 Ohio App.3d at 836-37; *Sanderson Farms, Inc. v. Gasbarro*, No. 01AP-461, 2004 Ohio App. LEXIS 1296, at \*\*17 (Ohio Ct. App. Mar. 24, 2004); *LeRoux's Billyle Supper Club v. Ma*, 77 Ohio App.3d 417, 432 (Ohio Ct. App. 1991).

In applying the alter ego test, not all of the seven factors must be met. In *Pottschmidt*, the court held that in order to satisfy the requirements of alter ego doctrine "a plaintiff must prove that the individual and the corporation are fundamentally indistinguishable." *Pottschmidt*, 169 Ohio App.3d at 836 (internal citations omitted). The *Pottschmidt* court referenced only four factors in determining that the alter ego test had been met: "1) whether corporate formalities were observed; 2) whether corporate records were kept; 3) whether corporate funds were commingled with personal funds; and 4) whether corporate property was used for personal use." *Id.* (citing *to LeRoux's*, 77 Ohio App.3d at 432, which outlines the seven factors adopted by *In re Fisher*).[14]

The United States alleges that both P.J.T. and Trimat are alter egos of Maurice and Patricia. The Court analyzes each corporation separately.

### a. P.J.T.

Construing the undisputed facts regarding P.J.T. and Maurice and Patricia in the light most favorable to the Tolers, the Court finds that four of the seven factors are met, including all of the factors used to find that alter ego doctrine had been satisfied in *Pottschmidt*.

First, it is undisputed that P.J.T. was insolvent at the time that the debt occurred. As of 1986,[15] P.J.T. was unable to fulfill its obligations to the Mounts under the Land Contract, such

---

[14] Similarly, in *Taylor Steel*, the Sixth Circuit found that even where none of the factors had been found, a corporation was still the alter ego for its sole shareholder. 417 F.3d at 606; *see also Petro v. Mercomp*, 167 Ohio App. 3d 64, 71 (Ohio Ct. App. 2006) (granting summary judgment even where the only factor considered for alter ego prong in piercing the corporate veil was that defendant was sole shareholder of corporation).

[15] The first year of income tax liability for Maurice and Patricia was 1985. Taxes are due and owing on the date on which tax is due to be filed. *United States v. Adams Bldg. Co.*, 531 F.2d 342, 343 (6th Cir. 1976). Thus, by 1986, a portion of Maurice and Patricia's debt had

that Maurice had to enlist his mother, Dorothy, to take out their mortgage in her name in order to pay off the Land Contract. Furthermore, Maurice and Patricia were also insolvent, as they testified in depositions that they were unable to pay the land contract, and could not get a loan in their own names due to poor credit. Given these facts, it is clear that factor three, insolvency of the debtor corporation at the time the debt is incurred, is met.

Second, it is clear that there is an absence of corporate records. In his deposition, Maurice testified that P.J.T. maintained books and records, had employees, and also maintained its own checking accounts. The United States, in interrogatories, asked the Tolers to produce any records of P.J.T. from 1980 onwards. The Tolers stated that there were no documents responsive to this request. This interrogatory response is a clear contradiction to Maurice's bare assertion that P.J.T. kept corporate records. As stated earlier, the non-moving party "may not rest upon its mere allegations." Fed. R. Civ. P. 56(e); *see Celotex*, 477 U.S. at 324; *Searcy*, 38 F.3d at 286. The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore*, 8 F.3d at 339-40. Maurice has been unable to present "significant probative evidence" with regards to the P.J.T. corporate records. Thus, the sixth factor, the absence of corporate records, is met.

Third, corporate funds were commingled with personal funds and corporate property was used for personal use.[16] Regarding corporate funds, Patricia deposited a check for more than $20,000 made out to P.J.T. and Trimat into her personal checking account. Regarding corporate

---

already accrued.

[16] While the "diversion of funds or other property of the company property for personal use" is considered one factor in *In re Fisher*, the court addressed these as two separate factors in *Pottschmidt*. *Pottschmidt*, 169 Ohio App.3d at 836-37.

property, Maurice and Patricia used P.J.T. property as their personal residence, long after P.J.T. is claimed to have ceased all activity (and, in fact, currently continue to reside on that same property ).  The entire Toler family used P.J.T. property for personal recreation, including hunting, fishing, sleigh rides, riding all-terrain vehicles, and riding horses.  In addition, Patricia and Trisha used P.J.T. to own horses to ride in horse shows, an activity that was solely for their own  personal enjoyment and recreation and had no relation to P.J.T.'s business activities.  It is clear from this uncontested evidence that the fifth factor, "diversion of funds or other property of the company property for personal use," is met.

Fourth, P.J.T. failed to observe corporate formalities.  Although Maurice and Patricia assert that P.J.T. observed all corporate formalities, once again a mere allegation is not enough to defeat summary judgment.  The Defendants allege that Dorothy provided hundreds of thousands of dollars in loans to P.J.T. in order to stop the company from folding and to provide assistance to her son and his family.[17]  None of these loans was documented.  It is beyond belief that a corporation which was complying with all formalities would neglect to record hundreds of thousands of dollars of loans.  Thus, the second factor, "failure to observe corporate formalities," has been met.

It should also be noted that Maurice and Patricia were the sole shareholders of P.J.T. at all times.  They were the only decision makers for the corporation, kept all the books and records, and made all of the corporate decisions.  Courts, applying Ohio law, have found this one

---

[17] The mere fact that Dorothy provided money to P.J.T. in order to assist her son and his family lends credence to the idea that P.J.T. and Maurice and Patricia were alter egos and could not be distinguished.  Dorothy could have lent the money directly to Maurice, but instead lent the money to P.J.T., despite the fact that her motivation was to help her son.

factor to be enough to find alter ego. *See Taylor Steel*, 417 F.3d at 605; *Petro*, 167 Ohio App. 3d at 71. Here, there are four additional factors that were satisfied. For the above stated reasons, this Court finds that Maurice and Patricia J. Toler were alter egos of P.J.T.

## b. Trimat

In applying the factors identified above to Maurice and Patricia's relationship with Trimat, only one of the factors is fully satisfied. This factor is the "diversion of funds or other property of the company property for personal use." The evidence in regards to this factor is staggering. It is undisputed that Patricia deposited a $20,000 check to P.J.T. and Trimat into her personal account. In 1997, the Toler's purchased a corvette with Trimat funds. The car, for which Patty signed a check on behalf of Trimat, was worth $28,575.00. In 1998, the Toler's purchased a Lincoln Navigator with Trimat funds. That same year, Maurice and Patricia purchased a 22-foot Sea Ray boat, which was titled to Matthew but paid for with Trimat funds. Insurance for the Sea Ray was held in Maurice's individual capacity. The three vehicles together cost approximately $90,000. Patricia also bought home furnishings, a home spa cover, and bedroom accessories with Trimat funds. Matthew Toler purchased $1,917.01 in guns and related accessories in 1997, and Trisha's high school class ring was bought with Trimat's corporate account. These are not, as the Defendants attempt to claim, one off examples of commingling typical in close corporations. This is a clear, systematic abuse of the corporate form. Additionally, Maurice held himself out as the owner/manager of Trimat in order to obtain a $400,000 life insurance policy. When it was convenient to Maurice, there was no issue in holding himself out as a manager, but when there is an issue of tax liability, Maurice attempts to

shed himself of any responsibility.  This cannot be tolerated.  As a result, the Court finds that

Maurice and Patricia Toler are alter egos of Trimat.

### c. Land Parcels

The finding of alter ego status for P.J.T. and Trimat affects three of the parcels at issue,

D, E and F, directly.[18]  As already shown, P.J.T. and Trimat were the alter egos of Maurice and

Patricia.  This is enough to establish an interest in the parcels owned by P.J.T. and Trimat, such

that these parcels are property under the federal tax lien statutes.  The Supreme Court has held

that § 6321 "is broad and reveals on its face that Congress meant to reach every interest in

property that a taxpayer might have." *Nat'l Bank of Commerce*, 472 U.S. at 719-20; *see also*

*Glass City Bank*, 326 U.S. at 267 ("Stronger language could hardly have been selected to reveal

a purpose to assure the collection of taxes.").  In addition, the United States may recover

property held by a third party if it is determined that the third party is holding the property as an

alter ego of the delinquent taxpayer.[19]  *G.M. Leasing Corp. v. United States*, 429 U.S. 338

---

[18]  The Defendants claim that "[i]mportantly, each of the above IRS tax assessments was made after a majority of the initial property transfers from P.J.T., Inc. To Dorothy."  This Court understands from the facts presented that three out of seven of the properties at issue were transferred after assessments had been made, and finds the Defendants' statements to be disingenuous and misleading.

[19]  This Court's determination that once a corporation is found to be an alter ego, its property may be reached under 26 U.S.C. § 6321 pursuant to federal law is not inconsistent with its earlier refusal to apply federal common law in determining whether alter ego theory was available to the United States.  The Court, following the Supreme Court in *Drye*, first looked to state law to determine if the alter ego doctrine was recognized by Ohio law (it is), and then looked to federal law to determine if the alter ego interest qualified as a property interest for federal tax liens, which it is under *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350-51 (1977).

(1977).  The remaining question, then, is one of timing, and whether the liens had attached prior to the transfers to Dorothy, Trimat, and Trisha.

Parcel D was transferred by P.J.T. to Dorothy in 1997.  Parcel E was transferred from P.J.T. to Trimat in 1997.   The federal tax assessments for income tax years 1985-1990 were assessed on September 3 and 23, 1996.  As stated above, under § 6322, a lien attaches at the time of assessment.  "Transfer of property subsequent to the attachment of the lien does not affect the lien[,]" which instead follows the property."  *United States v. Bess*, 357 U.S. 51, 57 (1958); *see also United States v. Bank of Celina*, 721 F. 2d 163, 166 (6th Cir. 1983).  Thus, because P.J.T. was the alter ego of Maurice and Patricia, the liens on Parcels D and E had already attached, and continued with the parcels through the subsequent transfers.  Furthermore, Parcel E was not transferred to Trisha until November 10, 2004.  The remaining federal income tax liability was assessed on March 3, 2004.  Because Trimat is the alter ego of Maurice and Patricia, Parcel E had liens attached to it for all of the joint federal income tax liability, and these attachments continued with the property in its subsequent transfer to Trisha.

Parcel F remained in P.J.T.'s possession until November 18, 2004, at which point it was transferred to Trisha.  By November18, 2004 the liens for all of the joint income tax liabilities had attached to Parcel F.  This is because P.J.T., the alter ego of Maurice and Patricia, held title to Parcel F.  Therefore, Parcel F may also be foreclosed upon.

Parcels A, B, C, and G were transferred from P.J.T. to Dorothy prior to the federal tax assessments, and the tax liens therefore were not transferred along with the properties.  In order to foreclose on Parcels A through C, and to prevail in Plaintiff Patricia A. Toler's ("Trisha's")

wrongful levy suit, the United States must prove that the transfers to Dorothy were fraudulent. This issue is discussed in the following section.

Therefore, for the reasons stated above, the United States' Motion for Summary Judgment on enforcing the federal tax liens by foreclosure on Parcels D, E, and F**,** and to have Parcels D, E, and F sold free and clear of all liens and interests of the parties, with proceeds of the sale to be distributed according to the parties' lawful priorities**,** is hereby **GRANTED**.

### 3.  Fraudulent Conveyance

As stated in the preceding section, Parcels A, B, C, and G were transferred to Dorothy prior to the IRS tax assessments.  Where a taxpayer is alleged to have fraudulently disposed of her property prior to the existence of a tax lien, the United States may seek relief under the applicable fraudulent conveyance laws of the state in which the property is located.  *United States v. Smith*, No. 1:99 cv-974-TSH, 2008 U.S. Dist. LEXIS 96869, at *9-10 (S.D. Ohio Nov. 19, 2008) (citing to *Comm'r v. Stern*, 357 U.S. 39, 45 (1958)).  In this case, the property at issue is located in Ohio, thus Ohio law applies.  The Ohio Uniform Fraudulent Conveyances Act ("UFCA"), which is the predecessor to the current Ohio Uniform Fraudulent Transfer Act, controls for transfers occurring before September 28, 1990.  *United States v. LaBine*, 73 F.Supp.2d 853, 856 (N.D. Ohio 1999); *In re Carmean*, 153 B.R. 985, 989 (Bankr. S.D. Ohio 1993).  The UFCA is codified as follows:

> Where a conveyance or obligation is fraudulent as to a creditor, when his claim has matured, may, as against any person, except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase,
>
>> 1) Have the conveyance set aside or obligation annulled to the extent necessary to satisfy the claim, or

2) Disregard the conveyance and attach or levy execution upon
　　　　　　　the property conveyed.

Ohio Rev. Code Ann. §1336.09(A) (Anderson 1979) (repealed 1990).  Ohio law recognizes two

types of fraud for the purpose of fraudulent conveyances, actual fraud and constructive fraud.

*United States v. Berman*, 884 F.2d 916, 921 (6th Cir. 1989).  The United States alleges actual

fraud.[20]

　　　　　The burden of proof in a fraud case rests with the party alleging fraud, in this case the

United States.  *Smith*, 2008 U.S. Dist. LEXIS 96869 at *11 (citing to *Cardiovascular & Thoracic*

*Surgery of Canton, Inc. v. DiMazzio*, 37 Ohio App. 3d 162, 166 (Ohio Ct. App.1987).  Ohio

courts have recognized that direct proof of fraud may be impossible.  *United States v. Leggett*,

292 F.2d 423, 426 (6th Cir. 1961); *Stein v. Brown*, 18 Ohio St. 3d 305 (Ohio 1985).  As a result,

Ohio courts have held that inferences can be drawn from the circumstances surrounding the

transaction to prove actual fraud.  *Berman*, 884 F.2d  at 922; *Stein*, 18 Ohio St. 3d at 308.  These

circumstances are referred to as "indicia" or "badges" of fraud.[21]  *Berman*, 884 F.2d at 922;

---

[20]  The statute expressly applies to future creditors, thus the fact that the tax assessments
were not yet made does not prevent the transfers from being fraudulent as to the United States.
*Ohio Rev. Code. Ann. § 1336.07 (Anderson 1979)(repealed); Kaiser v. Stedman*, No. C:2-95-
1074, 1999 U.S. Dist. LEXIS 15327, at *50 (S.D. Ohio Sept. 9, 1999).  Furthermore, income tax
liability arises no later than the last day of the taxable period.  *United States v. Adams Bldg. Inc.*,
531 F.2d 342, 343 n. 2 (6th Cir. 1976)*; United States v. LaBine*, 73 F. Supp. 2d 853, 860 (N.D.
Ohio 1999).  Thus, the United States became a creditor of Maurice and Patricia (and P.J.T. as
their alter ego) beginning on January 1, 1986 for income tax year 1985.  The first transfer did not
take place until March 23, 1987.  The Toler's argue that they did not have notice of the IRS's
creditor status.  While it is true that Maurice and Patricia did not have notice of the IRS
assessments until 1996, they were well aware that they had neglected to pay their taxes, and so to
claim that they were not on notice until 1996 is not a viable argument.

[21]  The badges of fraud are codified by Ohio Rev. Code Ann. §1336.04(B), however they
were not codified prior to 1990, therefore this Court will use the badges of fraud established by
common law prior to 1990.

*DiMazzio*, 37 Ohio App. 3d at 166. The badges of fraud include: inadequate consideration, transfer of the debtor's entire estate, insolvency resulting from the transfer, the relationship of the parties, the debtor's retention of an interest, benefit, or control in the transferred property, and a threat or pendency of litigation. *See United States v. Berman*, 844 F.2d at 922; *Wagner v. Galipo*, 97 Ohio App. 3d 302, 309 (Ohio Ct. App. 1994); *DiMazzio*, 37 Ohio App.3d at 166; *Kaiser*,1999 U.S. Dist. LEXIS 15327 at *51-52; *United States v. Mantarro*, No. 88 CB871, 1992 U.S. Dist. LEXIS 21696, at *4 (N.D. Ohio June 19, 1992).

If the party alleging fraud is able to demonstrate a sufficient number of badges of fraud exist, the burden shifts to the defending party to prove that the conveyance was not fraudulent and that there was a legitimate purpose for the transfer. *DiMazzio*, 37 Ohio App.3d at 166; *Baker & Sons Equip. Co. v. GSO Leasing, Inc*., 87 Ohio App.3d 644, 650 (Ohio Ct. App. 1993); *Smith*, 2008 U.S. Dist. LEXIS 96869 at *13.

### a. Badges of Fraud

The Court now turns to an analysis of whether a sufficient number of badges were present in the transfers of Parcels A, B, C, and G in order to shift the burden to Maurice and Patricia to rebut the presumption of actual fraud. There are several badges of fraud present for each of these transfers.

### i. Relationship of the Parties

All of parcels were transferred from P.J.T., the alter ego of Maurice and Patricia, to Maurice's mother, Dorothy. It is undisputed that there is a close relationship between Maurice and Patricia, the sole shareholders and alter egos of P.J.T., and Dorothy.

### ii. The Debtor's Retention of an Interest, Benefit, or Control in the Transferred Property

P.J.T. and Maurice and Patricia retained the benefit and control of the transferred property. As stated by the Tolers in deposition testimony, the use of the land did not change because of the transfers to Dorothy. P.J.T. and Maurice and Patricia continued to use the land just as they had prior to the transfers.[22] The Tolers argue that Dorothy did not have to allow this use to continue, however this argument is inapposite, as the inquiry is not as to what *could* have been, but rather as to what was indeed the case.

### iii. Threat or Pendency of Litigation

The transfers of Parcels A and G occurred because of the pendency of litigation against P.J.T. by the Mounts. Dorothy took out the mortgage for her son because of this litigation. Maurice and Patricia then transferred the land from P.J.T. to Dorothy because of this mortgage. Additionally, at the time of these transfers, liability had already begun on two years of income tax liability (1985 and 1986).

### iv. Insolvency of the Transferees

According to the testimony of Maurice and Patricia, neither P.J.T. nor Maurice and Patricia had the capital to pay off the land contract with the Mounts. As a result, Dorothy had to give them assistance so that they could keep their farm and home (owned by P.J.T.). It is undisputed that neither P.J.T. nor Maurice and Patricia were solvent insofar as their ability to pay off their debts. This is supported by the Tolers' filing of bankruptcy in 1991.

### b. Burden Shifting

---

[22] Although some of the land ceased to be used in the early 1990s due to P.J.T.'s lack of operation, P.J.T. retained control of the land for as long as it continued to operate, thereby satisfying this badge of fraud.

The existence of these four badges of fraud is sufficient to transfer the burden to the Defendants to show that the conveyances were not fraudulent. Ohio courts have found as few as three badges to be clear and convincing evidence of actual fraudulent intent. *Blood v. Nofzinger*, 162 Ohio App.3d 545, 559 (Ohio Ct. App. 2005) (citing to *Bank One, N.A. v. Plaza East*, No. 97APE02-184, 1997 Ohio App. LEXIS 5126 (Ohio Ct. App. 1997)); *see also DiMazzio*, 37 Ohio App.3d at 166 (finding four badges of fraud enough to shift the burden). Thus, the United States has shifted the burden to the Defendants to show that the transfers were not fraudulent.

The Defendants allege that the transfers were made in good faith for adequate and fair consideration. Their evidence is based on the mortgage that Dorothy took out in order to pay the Mount Land Contract,[23] as well as statements in deposition testimony and in the briefing as to the numerous loans by Dorothy to P.J.T. The United States claims that the transfers were not in good faith for fair and adequate consideration, supported by the lack of any written documentation or records for these loans. Summary judgment is not appropriate where a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment regarding fraudulent conveyance of Parcels A through C is not appropriate given that there is a genuine issue of material fact as to whether the transfers to Dorothy were in good faith and for fair and adequate consideration. This is a determination that must be made by a jury, weighing the evidence presented by both sides. Therefore, for the reasons stated above, the United States' Motion for Summary Judgment on enforcing the federal tax liens by foreclosure on Parcels A through C is hereby **DENIED**.

---

[23] The Court also notes that the mortgage was for $125,000, whereas the Land Contract was for $200,000. Thus, there is a discrepancy of $75,000 that is not accounted for in their descriptions of the money lent by Dorothy.

## E.  WRONGFUL LEVY ON PARCEL G

The United States seeks summary judgment that plaintiff Patricia A. Toler ("Trisha") take nothing by way of relief requested in her complaint in the wrongful levy case.  In order to prove that a tax levy was wrongful, the person challenging the levy must show interest in the property to establish standing.  The burden then shifts to the IRS to prove a nexus between the property and the taxpayer.  If the IRS meets the burden, then the challenger bears the burden of proving the levy was wrongful.  *Ames Invst., Inc. v. United States*, No. 93-1859, 1994 US. App. LEXIS 27554, at *4 (6th Cir. Sep. 28, 1994).  Here, Trisha has clearly established standing as she has title to Parcel G.  There is a genuine issue of material fact as to whether the IRS has proved a nexus between the property and Maurice and Patricia.  As stated in Part IV D, there is a genuine issue of material fact as to whether Parcel G was fraudulently conveyed from P.J.T. to Dorothy.  *Anderson*, 477 U.S. at 251-52.  As a result, the Court cannot determine whether Maurice and Patricia have an interest in this property such that the levy on Parcel G was not wrongful.  The United States' Motion for Summary Judgment regarding Plaintiff Patricia A. Toler's ("Trisha's") wrongful levy complaint is therefore **DENIED.**

## F.  DEFENDANTS'  MOTION FOR SUMMARY JUDGMENT

The Defendants' moved this Court for Summary Judgment as to the invalidity of the United States' foreclosure claims.  As stated in Part IV D, there is a genuine issue of material fact as to whether Parcels A, B, and C were fraudulently conveyed, and thus whether foreclosure is proper. *Anderson*, 477 U.S. at 251-52.  The Court therefore cannot grant summary judgement as to those parcels.  As to Parcels D, E, and F, this Court has granted summary judgement for the

United States and against the Tolers. As a result, the Defendants' Motion for Summary Judgment on the United States' foreclosure case is **DENIED**.

**V. CONCLUSION**

For the foregoing reasons, this Court: (1) **GRANTS** the United States' Motion for Summary Judgment on Maurice and Patricia's federal income tax liability for $380,392.31, plus interest and statutory accruals from September 15, 2008; (2) **GRANTS** the United States' Motion for Summary Judgment on Maurice's liability for unpaid trust fund recovery penalties in the amount of $108,681.81, plus interest and statutory accruals from September 15, 2008; (3) **GRANTS** the United States' Motion for Summary Judgment on the existence of federal tax liens for the income tax liability of Maurice and Patricia for $767,289.37, and for the trust fund recovery penalty liability of Maurice for $108,681,81; (4) **GRANTS** the United States' Motion for Summary Judgment on enforcing the federal tax liens by foreclosure on Parcels D, E, and F**,** and to have Parcels D, E, and F sold free and clear of all liens and interests of the parties, with proceeds of the sale to be distributed according to the parties' lawful priorities; but (5) **DENIES** the United States' Motion for Summary Judgment on enforcing the federal tax liens by foreclosure on Parcels A through C; (6) **DENIES** the United States' Motion for Summary Judgment regarding plaintiff Patricia A. Toler's ("Trisha's") wrongful levy complaint; and (7) **DENIES** the Defendants' Motion for Summary Judgment on the United States' foreclosure case.

**IT IS SO ORDERED.**

       **s/Algenon L. Marbley**
       **ALGENON L. MARBLEY**
       **UNITED STATES DISTRICT JUDGE**

**DATED: September 28, 2009**